## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

L'ATHENE, INC.                                    )
494 Wando Park Blvd. Suite B                      )
Mt. Pleasant, S.C. 29464,                         )
                                                  )
      Plaintiff,                             )
                                                  )
v.                                                )     Civil Action No. 08-0114 (SLR)
                                                  )
EARTHSPRING LLC                                   )
25 South Arizona Place, Suite 550                 )
Chandler, AZ 85225,                               )
                                                  )
and                                               )
                                                  )
GREEK ISLAND LABS LLC                             )
25 South Arizona Place, Suite 550                 )
Chandler, AZ 85225,                               )
                                                  )
      Defendants.                            )

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER ACTION TO THE DISTRICT OF ARIZONA

Plaintiff L'Athene, Inc. ("Plaintiff" or "L'Athene"), by its undersigned counsel, hereby

opposes the Motion to Dismiss Complaint and in the Alternative Motion to Transfer Venue of

Defendants Earthspring LLC and Greek Island Labs LLC ("Defendants").

## I.      STATEMENT OF FACTS

L'Athene is a Delaware corporation in the business of manufacturing and selling skin care

products, including face and hand creams and lotions, eye creams, and cosmetic preparations.

Bogdan Aff. ¶ 4, attached hereto as Exh. A.  L'Athene is the owner of the federal service mark

registrations for L'ATHENE, U.S. Reg. No. 2375842, and L'ATHENE (AND DESIGN), U.S.

Reg. No. 2449924, for use in connection with its skin care products since at least as early as

September 1999.  *Id.* at ¶ 5.  The company has expended substantial sums in promoting the

L'Athene marks (collectively "Marks") in connection with its goods, including but not limited to significant expenditures devoted to research, advertising, marketing, sponsoring community-related events, and maintaining an Internet web site located at www.lathene.com.  *Id.*  at ¶ 6.

Defendants admit that they are engaged in the business of manufacturing and selling skin care products to a national market under the name ATHENA, almost exclusively via their interactive Internet website. Def.'s Mot to Dismiss, Tahiliani Aff. ¶¶ 2, 4, 6.  Defendants' website, www.7minutelift.com, is highly interactive, offering products for sale and allowing prospective customers to order products and provide detailed shipping and billing information. Bogdan Aff. ¶ 7.  At this stage in litigation, it is not known whether Defendants are maintaining or have maintained in the past additional interactive websites not yet disclosed, or what other marketing efforts for infringing products Defendants may have undertaken in Delaware.  Even so, Defendants admit that as a result of their geographically indiscriminate Internet marketing efforts, they have been selling products bearing the ATHENA name and logo in Delaware for the past five years, and are still selling these products in Delaware at this time.  Def.'s Mot to Dismiss, Tahiliani Aff. ¶¶ 4, 6.

In 2005 and again in 2007, Defendants applied to the United States Patent and Trademark Office ("USPTO") to register a number of marks incorporating the ATHENA name and logo. *See* Exh. B. The USPTO refused to register all of these marks, citing likelihood of confusion with the registered L'ATHENE marks.  *Id.*   On February 25, 2008, L'Athene filed suit against Defendants in the United States District Court for the District of Delaware, pleading three causes of action: trademark infringement, unfair competition, and common law infringement, for their activities marketing and selling products that have caused are likely to continue to cause confusion with the products L'Athene sells under its Marks. *See generally* Compl. 2-10.

## II.    ARGUMENT

### A.    This Court Has Personal Jurisdiction over Defendants.

This Court may exercise personal jurisdiction over a defendant so long as two requirements, one statutory and one constitutional, are met. *See Kloth v. Southern Christian Univ.*, 494 F. Supp.2d 273, 277-78 (D. Del. 2007). First, this Court must determine whether exercise of personal jurisdiction over a defendant is provided for by the Delaware long-arm statute, 10 *Del. C.* § 3104(c). *See id.* The Delaware Supreme Court construes the long-arm statute liberally, "to provide residents a means of redress against those not subject to personal service within the State." *Virgin Wireless, Inc. v. Virgin Ent. Ltd.*, 201 F. Supp.2d 294, 299 (D. Del. 2002).

Once the Court has determined that Delaware law authorizes jurisdiction, then the Court must find that exercise of personal jurisdiction is not contrary to the defendant's right to due process under the United States Constitution. *See Kloth*, 494 F. Supp.2d at 278. In the present case, Defendants are subject to the personal jurisdiction of this Court.

### 1.    The Delaware Long-Arm Statute Authorizes The Court to Exercise Specific Jurisdiction over Defendants.

The Delaware long-arm statute provides, in pertinent part, that

> a court may exercise personal jurisdiction over any nonresident, or
> a personal representative, who in person or through an agent:
> (1)    Transacts any business or performs any character of work
>         or service in the State;
> (2)    Contracts to supply services or things in this State; [or]
> (3)    Causes tortious injury in the State by an act or omission in
>         this State . . .

10 *Del. C.* § 3104(c). Defendants' Motion to Dismiss relies upon a selective, misleading, and at times plainly wrong, reading of case law. Under any construal of Delaware law, the long-arm statute confers upon this Court specific personal jurisdiction over Defendants.

a.    **Subsection (c)(1) confers jurisdiction over Defendants.**

The Delaware Supreme Court has determined that § 3104(c)(1) is a specific jurisdiction provision requiring a "nexus" between the plaintiff's cause of action and the defendant's conduct giving rise to jurisdiction. *Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc.*, 295 F. Supp.2d 400, 405 (D. Del. 2002). Where a defendant company operates an interactive website accessible in the forum state, the Third Circuit Court of Appeals has mandated a "purposeful availment" test to determine specific jurisdiction. *Kloth*, 494 F. Supp.2d at 279. "If a defendant web site operator... knowingly conducts business with forum state residents via the site, then the 'purposeful availment' requirement is satisfied." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003). In short, courts in the Third Circuit seek evidence that a defendant has engaged in "something more" than maintenance of a website that may be viewed in the forum state, to establish specific jurisdiction. *Kloth*, 494 F. Supp.2d at 279.

In a seminal case concerning specific jurisdiction based upon operation of a website, the United States District Court for the Western District of Pennsylvania held that purposeful availment is apparent where "a defendant makes a conscious choice to conduct business with the residents of a forum state." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1126 (W.D. Pa. 1997). Under such circumstances, the defendant "'has clear notice that it is subject to suit there.' ... If [defendant] had not wanted to be amenable to jurisdiction in Pennsylvania, ...it could have chosen not to sell its services to Pennsylvania residents." *Id.* at 1126-27 (quoting *World-Wide Volkswagen*, 444 U.S. 286, 297 (1980)); *see also Toys "R" Us, Inc.*, 318 F.3d at 454 (holding that "purposeful availment" is satisfied by "directly targeting its web site to the state, knowingly interacting with residents of the forum state via its website, or through sufficient other related contacts."). When the jurisdiction of the court is specific, rather than general, *no*

*showing that the contacts were "continuous and systematic" is required. TriStrata Technology,* 537 F. Supp.2d at 642.

In the present case, Defendants admit that they maintain an interactive website, www.7minutelift.com, that can be accessed from anywhere, including Delaware. *See* Bogdan Aff. ¶ 7. Defendants further admit that they market their products "principally over the Internet," and that 99% of sales are made via the Internet. Def.'s Mot. To Dismiss, Tahiliani Aff. ¶ 4. Defendants have sold and shipped 90 units in the past five years to customers in Delaware.[1] *Id.* at ¶ 6. Furthermore, sales of the infringing products in Delaware are rising. In the first quarter of 2008, Defendants have sold and shipped an additional 18 units to customers in Delaware – as many as Defendants sold annually, on average, in each of the previous five years. *See id.* Defendants' business conduct satisfies the rule established in *Toys "R" Us* and in *Zippo Mfg.* because they have knowingly operated an interactive website accessible from Delaware and conducted business with Delaware residents.

Furthermore, there is a clear nexus between Defendants' commercial activities in Delaware and the causes of action pled by L'Athene. The *Thorn EMI North Am., Inc. v. Micron Tech., Inc.* case, upon which defendants rely heavily, actually supports L'Athene's position. There, the court found that "sales of allegedly infringing products had been made to Delaware customers," and that those sales "constitute a business transaction in Delaware." *Thorn EMI*

---

[1]    Defendants suggest that the Court should turn a blind eye to their Delaware sales because there were only an alleged 90 sales in the past five years, out of an alleged total of 51,100 sales. However, the population of Delaware during that period was less than one percent of the United States population. *See* Exh. C, Table of Annual Estimates of the Population for the United States, Regions, States, and Puerto Rico: April 1, 2000 to July 1, 2007, *available at*: http://www.census.gov/popest/states/tables/NST-EST2007-01.xls. Thus, it is hardly surprising that sales to Delaware comprise less than one percent of Defendants' sales. By Defendants' logic, they would not be subject to personal jurisdiction in any of the less populous states, an absurd result.

*North Am., Inc. v. Micron Tech., Inc.*, 821 F. Supp. 272, 274-75 (D. Del. 1993). Thus, the court concluded, "the requisite nexus between the defendant's acts and the plaintiff's claimed injuries does in fact exist." *Id.* at 275. These facts are also true in the present case: Defendants have made sales of infringing products to Delaware customers, and such sales constitute business transactions in Delaware. Thus, the requisite nexus is present to confer upon this Court specific personal jurisdiction over Defendants.

In the section of their brief analyzing subsection (c)(1), Defendants also rely heavily on *Intel Corp. v. Silicon Storage Tech., Inc.*, 20 F. Supp.2d 690 (D. Del. 1998). The *Intel* case is easily distinguishable from the facts of the present case. The court in *Intel* found that defendant Silicon Storage Technology, Inc. ("SST") had not made any sales in Delaware other than a single sale to plaintiff's counsel after the filing of the complaint, and further found that SST did not even have any prospective customers in Delaware. *Intel Corp.*, 20 F. Supp.2d at 696-697. By contrast, Defendants in the present case admit that they have been making sales in Delaware on an ongoing basis for the past five years. Def.'s Mot. to Dismiss, Tahiliani Aff. ¶ 6.

In short, knowingly transacting business in Delaware by selling infringing products to Delaware residents through an interactive website accessible in Delaware constitutes a nexus with the causes of action in this suit, and Defendants are properly subject to the jurisdiction of this Court under 10 *Del. C.* § 3014(c)(1).

**b.    Subsection (c)(2) confers jurisdiction over Defendants.**

Defendants are subject to the jurisdiction of this Court under 10 *Del. C.* § 3104(c)(2) for essentially the same reasons discussed above. As with subsection (c)(1), subsection (c)(2)

provides specific jurisdiction over defendants who have contracted to supply services or things in Delaware. 10 *Del. C.* §3104(c)(2); *Parker v. Learn the Skills Corp.*, 530 F. Supp.2d 661, 672 (D. Del. 2008). Defendants admit that they have contracted to supply the subject products in Delaware. Def.'s Mot. to Dismiss 6. As discussed above, Defendants' ongoing and increasing sales of infringing products in Delaware establish a nexus with the cause of action under the analysis of the *Thorn EMI* case.

In opposing jurisdiction under subsection (c)(2), Defendants rely again on the *Intel* case, alleging that this case stands for the proposition that "the contracts for services or things must have a 'substantial nexus' to the plaintiff's causes of action. *Intel*, 20 F.Supp 2d at 698…" Def.'s Mot to Dismiss 6. In the first place, the phrase "substantial nexus" does not appear anywhere in the *Intel* opinion.[2]  More importantly, the appropriate analysis for establishing nexus sufficient for specific personal jurisdiction is the analysis found in the *Thorn EMI* case, discussed above. It appears that Defendants are attempting to slip into the test for nexus an element of subsection (c)(4), that the defendant "derives substantial revenue from services, or things used or consumed" in Delaware. 10 *Del. C.* § 3104(c)(4). The "substantial revenue" test is appropriate in cases where the Court is asserting *general* jurisdiction over a party. In this case, the Court has *specific* jurisdiction over Defendants under subsections (c)(1), (c)(2), and (c)(3), owing to the nexus between Defendants' in-state activities and the causes of action complained

---

[2]  The page of the *Intel* opinion cited by Defendants concerns the *Intel* plaintiff's "stream of commerce" theory of personal jurisdiction, which is not relevant in the present case because Defendants admit that their products reached Delaware by being shipped there directly and intentionally by Defendants, rather than through a stream of commerce. Page 697 of the opinion does use the term "sufficient nexus," though this is in the context of analyzing whether a single sale in Delaware to plaintiff's counsel, transacted subsequent to filing the suit, was sufficient to establish jurisdiction. *Intel*, 20 F. Supp.2d at 697. Again, this fact pattern and its analysis is not relevant to the present case, in which Defendants admit to having made numerous sales to actual Delaware customers.

of by L'Athene. Thus, the Court should disregard Defendants' disingenuous argument requiring a "substantial nexus" test.

###     c.    Subsection (c)(3) confers jurisdiction over Defendants.

Subsection (c)(3) provides for specific jurisdiction over a defendant who "causes tortious injury in the State by an act or omission in this state." 10 *Del. C.* § 3104(c)(3). In patent infringement claims, a patentee's injury occurs where the infringing product is sold. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1570 (Fed. Cir. 1994). This Court recently applied these legal principles in a case involving a defendant who solicited business in Delaware through a nationwide e-mail solicitation campaign, and as a result received and filled orders for the infringing product from Delaware residents. *TriStrata Technology, Inc. v Emulgen Labs., Inc.*, 537 F. Supp.2d 635 (D. Del. 2008). The defendant in *TriStrata* argued that the e-mail campaign was not, and could not, be intentionally targeted toward Delaware residents, because of the non-geographically linked nature of e-mail addresses. *Id.* at 640-41. The Court rejected this argument, holding that the defendant's use of the Internet for marketing—in light of the absence of any record evidence that defendant attempted to limit its marketing or shipment of product to certain states only—subjected the defendant to jurisdiction in Delaware. *Id.* at 640-41.

The analogy could not be any plainer between the conduct of the defendants in *TriStrata* and the conduct of the present Defendants. In both cases, the defendants used the Internet as a means of marketing the products in question, indiscriminately targeting potential customers across the country. In both cases, these marketing efforts yielded orders from Delaware residents, which the defendants filled, accepting payment from Delaware residents and shipping the product to Delaware. Given the Federal Circuit's determination that a patentee's injury

occurs where the product is sold, it is plain that Defendants in this matter are subject to the jurisdiction of this Court under 10 *Del. C.* § 3104(c)(3).

        **2.    Exercise of Personal Jurisdiction over Defendants by this Court Does Not Violate the Due Process Clause.**

Having found that it has jurisdiction over Defendants as provided for by the Delaware long-arm statute, the Court must next consider whether exercise of this jurisdiction would violate Defendants' rights to due process under the United States Constitution. Defendants' due process rights are not violated where defendants have engaged in "minimum contacts" with the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). Where a defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum state," assertion of jurisdiction would not offend due process guarantees. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

The test for purposeful availment in the context of a corporation marketing its products on the Internet was explicated in the seminal *Zippo Mfg.* case. Purposeful availment is apparent where "a defendant makes a conscious choice to conduct business with the residents of a forum state." *Zippo Mfg.*, 952 F. Supp. at 1126. Under such circumstances, the defendant "has clear notice that it is subject to suit there." *Id.* (citing *World-Wide Volkswagen*, 444 U.S. 286, 297 (1980)); *see also  Toys "R" Us, Inc.*, 318 F.3d at 454 (holding that "purposeful availment" is satisfied by "directly targeting its web site to the state, knowingly interacting with residents of the forum state via its website, or through sufficient other related contacts.").

In addition to considering whether a defendant has purposefully availed itself of the privilege of conducting activities in a forum state, courts also consider 1) whether the defendant could have reasonably anticipated being sued in the forum state, *World-Wide Volkswagen*, 444

U.S. at 291-93; 2) the burden imposed on the defendant in litigating in the forum, *Asahi Metal Ind. Co. v. Superior Ct. of California*, 480 U.S. 102, 114 (1987); and 3) the interests of the plaintiff and the forum state. *Id.*

Here, there is no question that Defendants have purposefully availed themselves of the privilege of conducting business in Delaware. Over at least a five year period and continuing to the present day, Defendants have operated an interactive website accessible from Delaware, www.7minutelift.com, have received orders and payments from Delaware residents, and have shipped products to customers in Delaware. *See* Def.'s Mot. To Dismiss, Tahiliani Aff. ¶6. Furthermore, Defendants' sales in Delaware defeat any assertion that Defendants could not reasonably anticipate being sued in Delaware, because "[w]hen it sells its products in a state, the alleged infringer has fair warning that it can be sued there." *TriStrata Technology*, 537 F. Supp.2d at n.3 (quoting *Precimed S.A. v. Orthogenesis, Inc.*, No. 04-1842, 2004 WL 2630596, at *2 (E.D. Pa. Nov. 17, 2004)).

Delaware has a significant interest in "discouraging injuries that occur within the state, which extends to patent infringement actions." *Energy Transportation Group, Inc. v William Demant Holding A/S*, No. C.A. 05-422, 2008 WL 78748, at *5 (D. Del. Jan. 4, 2008). (A copy of this decision is included herewith as Exh. D.) There is no reason to suppose that Delaware's interest would be reduced in the case of a trademark infringement, as compared to patent infringement. Plaintiff L'Athene, a Delaware corporation, likewise has a significant interest in being able to vindicate its rights in its trademark in its home jurisdiction. By contrast, Defendants have not demonstrated that by being obliged to litigate in Delaware they would be so heavily burdened as to outweigh the interests of L'Athene and Delaware. This Court has held, in the case of an overseas defendant, that the mere expense associated with travel to defend itself

did not outweigh Delaware's interest in providing a forum. *Id.* This is because "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *Id.* (citing *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1569 (Fed. Cir. 1994)). The balancing of equities undertaken in *Energy Transportation Group*— according to which this Court permitted a suit to go forward in Delaware against a Danish corporation—are even more compelling in the present case of Defendants, which are Arizona business entities. For example, by defending a lawsuit in Delaware, a Danish corporation would be obliged to engage in international travel and to litigate in a foreign language. Defendants have not suggested they would be obliged to bear any comparable burden by defending the present lawsuit in Delaware. Thus, when all the circumstances are taken into account, exercise of jurisdiction over Defendants by this Court would not violate due process guarantees and would not offend traditional notions of fair play and substantial justice.

**B.    Venue in the District of Delaware Is Proper.**

Venue is proper for the present action under 28 U.S.C. § 1391(b), which provides, in relevant part, that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated…" 28 U.S.C. § 1391(b)(2). In the present case, L'Athene suffered the harm of its trademark infringement when Defendants sold their infringing products in the State of Delaware. *See Beverly Hills Fan Co.*, 21 F.3d at 1570. Furthermore, it is not necessary that "a majority of the events take place [in the challenged forum], nor that the challenged forum be the best forum for the lawsuit to be venued." *Traynor v. Liu*, 495 F. Supp.2d 444, 450 (D. Del. 2007) (quoting *Park Inn Int'l v. Mody Enters., Inc.*, 105 F. Supp.2d 370, 376 (D.N.J. 2000)); *see also Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294-

296 (3d Cir. 1994). The substantiality requirement requires only that the acts or omissions in question "have a close nexus to the wrong." *Traynor*, 495 F. Supp.2d at 451. Regardless of whether Defendants' sales activities in Delaware constituted a majority of their sales of infringing products, these sales have a close nexus to the wrongs pled in the Complaint, as is evident from the analysis of nexus found in the *Intel* case and discussed more completely above. Therefore, Defendants' sales in Delaware form a substantial part of the subject matter of the present suit, and venue is proper in the District of Delaware.

C.    **The Court Should Neither Dismiss This Action Based on *Forum Non Conveniens*, Nor Transfer This Action to the United States District Court for the District of Arizona.**

In considering a motion to dismiss a suit for *forum non conveniens* or in the alternative to transfer to an alternative venue, courts in the Third Circuit consider the factors described in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995). Under *Jumara*, courts should take into account both private and public interests, including:

- plaintiff's choice of forum;
- defendant's preferred forum;
- where the claim arose;
- the convenience of the parties;
- the convenience of the witnesses, to the extent they may be unavailable for trial;
- the location of books and records, to the extent they may be unavailable for trial;
- the enforceability of a judgment;
- practical considerations that could make the trial easier, quicker, or less expensive; and
- public policies of the for a.

*Id.* at 879-80. Among these factors, a plaintiff's choice of forum is entitled to "paramount consideration" and "should not be lightly disturbed, because a corporation's decision to incorporate in a particular state is a rational and legitimate reason to choose to litigate in that state." *TriStrata Tech., Inc.*, 537 F. Supp.2d at 643. L'Athene has incorporated and filed suit in Delaware, and these decisions are entitled to the Court's paramount consideration and weight.

With regard to the remaining, less significant factors, Defendants allege that Defendants' witnesses and documents are located in Arizona. Def.'s Mot. to Dismiss 17. While this may be the case, there is no reason to suppose that such witnesses or records *would be unavailable for trial in Delaware*. Moreover, L'Athene has demonstrated its desire to incorporate and litigate in Delaware, rendering Defendants' bald assertion that the case should be tried in Arizona because L'Athene is located in South Carolina simply preposterous.

In light of the demonstrated preference of Plaintiff L'Athene to litigate in Delaware, the availability of material records and witnesses to be brought to Delaware for trial, and the policy interest of Delaware in protecting its citizens from the confusion that results from trademark infringement, there is absolutely no basis for the Court to dismiss this action on the basis of *forum non conveniens*, or in the alternative, to transfer the action to Arizona.

## III.     CONCLUSION

For all the foregoing reasons, L'Athene respectfully requests that the Court deny Defendants' Motion to Dismiss Or, in The Alternative, to Transfer Action to The District of Arizona.

SAUL EWING LLP

OF COUNSEL:

Michael Robinson (DE No. 4452)

Sherry H. Flax                          Michael Robinson (DE No. 4452)
SAUL EWING, LLP                         222 Delaware Avenue, Suite 1200
Lockwood Place                          P.O. Box 1266
500 East Pratt Street, Suite 900        Wilmington, DE  19899
Baltimore, MD 21202-3171                (302) 421-6800
Ph: (410) 332-8600                      (302) 421-6813
Fax: (410) 332-8862                     mrobinson@saul.com

                                        *Counsel for Plaintiff L'Athene, Inc.*

Dated:  May 8, 2008

# EXHIBIT A

L'ATHENE, INC.                              )
494 Wando Park Blvd. Suite B               )
Mt. Pleasant, S.C. 29464,                  )
                                           )
        Plaintiff,                         )
                                           )
v.                                         )        Civil Action No. 08-0114
                                           )
EARTHSPRING LLC                            )
25 South Arizona Place, Suite 550          )
Chandler, AZ 85225,                        )
                                           )
and                                        )
                                           )
GREEK ISLAND LABS LLC                      )
25 South Arizona Place, Suite 550          )
Chandler, AZ 85225,                        )
                                           )
        Defendants.                        )

## AFFIDAVIT OF LILLIAN BOGDAN

I, the undersigned, Lillian Bogdan, after being duly sworn, make the following statements

based upon my personal knowledge:

1. I am over eighteen years of age and competent to testify to the matters herein.

2. My business address is 494-B Wando Park Boulevard, Mt. Pleasant, South Carolina
   29464.

3. I am a director and shareholder of L'Athene, Inc. and have been with the company since
   1997.

4. L'Athene is incorporated in Delaware, and is in the business of manufacturing and selling
   skin care products, including face and hand creams and lotions, eye creams, and cosmetic
   preparations.

972476.1 4/30/08


EXHIBIT
*A*

5. L'Athene is the owner of the federal service mark registrations for L'ATHENE, U.S. Reg. No. 2375842, and L'ATHENE (AND DESIGN), U.S. Reg. No. 2449924, for its skin care products.

6. L'Athene has spent a substantial amount of money to promote the L'Athene marks (collectively "Marks") in connection with its goods. This effort includes, but is not limited to, significant expenditures devoted to research, advertising, marketing, sponsoring community-related events, and maintaining an Internet web site located at www.lathene.com.

7. I have visited the website www.7minutelift.com and have found that it sells skincare products to the public bearing the ATHENA name and logo. It allows customers to input their personal information, including name, address, and credit card information. It also allows customers to indicate how many products bearing the ATHENA name and logo the customer would like to purchase. Attached to this affidavit are printouts of some of the pages I have viewed.


I HEREBY DECLARE under the penalties of perjury that I have read the foregoing statements, which are true and correct to the best of my knowledge.


_____
Lillian Bogdan





**Athena 7 Minute Lift™ was recently mentioned on Good Morning America® by best-selling author Dr. Eric Kaplan. Doctor and Mrs. Kaplan both currently use and highly recommend Athena 7 Minute Lift™ as a safe and effective alternative to Botox®.**

*- May 17th, 2007*



# New Clinically Proven Greek Beauty Secret Revealed

## Reduce the appearance of Sagging Skin, Lines, and Wrinkles *WITHOUT* painful, expensive injections, and *WITHOUT* dangerous muscle relaxers or harsh chemical ingredients*.



☑ Clinically Proven Results.

☑ Works in Just 7 Minutes.

☑ Impressive Results on Frown Lines, Laugh Lines, Under Eye Wrinkles and Crows Feet.

☑ Hypoallergenic - Safe and Effective for All Skin Types.

☑ 60 Day Risk Free Trial.

☑ Free FedEx Shipping.

☑ See Our Amazing <u>Before and After Photos</u>.

☑ Answers to <u>Frequently Asked Questions</u>.

☑ Read Our Recent <u>Customer Reviews</u>.

## ATHENA
### 7 MINUTE LIFT™

## <u>Clinically Proven</u>
## <u>at one of the Nation's Top Cosmetics Laboratories:</u>

*"...in seven minutes it significantly reduced the appearance of fine lines and facial wrinkles an average of 83.72% on a full-face evaluation."*

<u>Read More</u> >

**Featured In These Popular Health Magazines:**

   

*"This product is extremely impressive. In my 17 years in practice, this is the first time I've seen a product produce such amazing results. There are no gimmicks, no harmful muscle relaxers, no hazardous chemicals. Athena 7 Minute Lift™ is blended with 12 Organic Essential Oils and it really works in just 7 minutes!"*

**- Dr. Mark Binette M.D.***





Look Younger in 7 Minutes


**60 DAY SUPPLY**
ORDER NOW   - CLICK HERE -



**Risk Free Trial**
with our 60 Day
**Money Back
Guarantee**

All Orders Shipped Within 24 Hrs.

**Click Here to Receive Dr. Binette's Free
Skin Care Secrets Report!**

Questions?
Click here to leave
us a message. >>>

**Promotional Price:
$89**
Includes FREE
FedEx Shipping.
**One Jar is a
60 Day Supply**

**For Telephone Orders Please Call: 1-800-853-8840**

Countries we ship to:
USA - Canada - United Kingdom - Australia - Denmark - France - Germany - Greece
Guam - Hong Kong - Ireland - Italy - Japan - Netherlands - Netherlands Antilles
New Zealand - Norway - Puerto Rico - Singapore - Spain - Sweden


Athena 7 Minute Lift™ is featured in
Dr. Eric Kaplan's best selling book
"Dying to be Young, a Cosmetic
Nightmare a Spiritual Awakening".

Home | Ingredients | FAQ's | Tell-a-Friend | Return Policy | Privacy Policy | Contact Us | Retailers

Copyright © 2006 - 2007 Greek Island Labs LLC. * Dr. Binette, M.D. believes in the product so much that he is now a consultant for Athena 7-Minute Lift. Athena 7-Minute Lift is a topical cream that reduces the appearance of fine lines and wrinkles. Nothing contained in this website should be inferred that the results replaces surgical procedures. Results may vary on an individual basis.

**RISK FREE 60 Day Money Back Guarantee with each order!**
Click Here For <u>Customer Service</u> or call: 1-800-853-8840

**Billing and Credit Card Information is Encrypted and SECURED for Your Protection**

---

**Shipping Information**

Featured By: **AOL**

Recently featured by AOL as one of the top 5 anti-wrinkle cream products on the market!

**SECURITY VERIFIED**
**TRUST GUARD**
4/30/2008

First Name:
Last Name:
Address:

City:
State/Province/Region:
Country: United States
Zip/Postal Code:
Phone:
Email Address:

Marjorie Davies - Age 63
Before    After 7 Minutes

☑ Results In 7 Minutes
☑ Safe & Effective

thawte 100% Secure

---

**Ordering Information**

quantity                                                                amount

1                                                                    $89.00

**One Jar of Athena 7 Minute Lift™ In Stock!**
**FREE FedEx Shipping!**
A Jar can last up to 60 days, depending on use.

Orders within the United States can be expected
to arrive within 2 to 5 business days.

Buy 2 or more jars and get FREE <u>Overnight</u> FedEx Shipping!

When you join our V.I.P. Bi-Monthly Delivery Program, you will receive **FREE** FedEx shipping and an extra 11% discount on all future V.I.P. Delivery orders. (Only **$79.21** per Order!) Including this order now! We will automatically send your next jar of 7 Minute Lift™ 60 days from the date of this purchase. Your card will be conveniently billed for your purchase automatically. You may cancel at any time.

- ⦿ **No thanks**, Send me only the quantity of this order
- ○ **Enroll Now!** Send me one jar of Athena 7 Minute Lift™ every 60 Days

---

☑ Results In 7 Minutes    ☑ Safe & Effective    ☑ Look Younger    ☑ No Painful Injections    ☑ Easy to Apply

**Credit/Debit or Bank Card Information**

Card Type:        Card Number:              Expiration Date:
Visa                                         1    2008



**SECURE FORM - ORDER WITH CONFIDENCE**

**Express Delivery (Optional)**

☐ **Overnight Delivery Option. Get your product faster for just $14.97!**
**(Available only in the United States.\*)**

Order Summary



FedEx Free Shipping

How did you hear about us? Internet

FREE FedEx SHIPPING

**PROCESS YOUR ORDER NOW**
**- CLICK HERE -**

| | |
|---|---|
| Subtotal: $ | 89.00 |
| Tax: $ | 0.00 |
| Shipping: $ | 0.00 |
| Total: $ | 89.00 |

Arizona shipping address will be charged sales tax @ 7.8%

Enter Code
_____ (optional):

**Apply**

thawte 100% Secure

**To order by phone: 1-800-853-8840**

Greek Island Labs, LLC. - Athena 7 Minute Lift ™ © 2008
7620 East McKellips Road
Suite 4 PMB 86 - Scottsdale AZ 85257

We Ship To The Following Countries:
United States - Canada - United Kingdom - Australia - Denmark -
France - Germany - Greece - Guam - Hong Kong - Ireland - Italy -
Japan - Netherlands - Netherlands Antilles - New Zealand - Norway -
Puerto Rico - Singapore - Spain - Sweden



# EXHIBIT B

Document Description: **Offc Action Outgoing**    Mail / Create Date: 28-Sep-2006

You are currently on page ☐1☐ of ☐28☐

# UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO:**    76/646297

**APPLICANT:**    EARTHSPRING, LLC

**CORRESPONDENT ADDRESS:**
    CRYSTAL A. RUSSELL
    LAW OFFICES OF CRYSTAL A. RUSSELL
    237 W MAIN ST
    MESA, AZ 85201-7311

**MARK:**    ATHENA 7 MINUTE LIFT

**CORRESPONDENT'S REFERENCE/DOCKET NO:**  N/A

**CORRESPONDENT EMAIL ADDRESS:**

# *76646297*

RETURN ADDRESS:
Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451

Please provide in all correspondence:

1. Filing date, serial number, mark and applicant's name.
2. Date of this Office Action.
3. Examining Attorney's name and Law Office number.
4. Your telephone number and e-mail address.

### (a)   OFFICE ACTION

**RESPONSE TIME LIMIT**:  TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE MAILING OR E-MAILING DATE.

**MAILING/E-MAILING DATE INFORMATION**:  If the mailing or e-mailing date of this Office action does not appear above, this information can be obtained by visiting the USPTO website at http://tarr.uspto.gov/, inserting the application serial number, and viewing the prosecution history for the mailing date of the most recently issued Office communication.

Serial Number  76/646297

The assigned trademark examining attorney has reviewed the referenced application and applicant's response dated 8/10/2006 and has determined the following:

**Section 2(d) Refusal Maintained and Continued and made FINAL**

**EXHIBIT**

*B*

Registration was refused under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d), because the applicant's mark so resembles the mark shown in U.S. Registration No. 2375842 as to be likely, when used on the identified goods and services, to cause confusion, to cause mistake, or to deceive.

        (b)    **The examining attorney has considered the applicant's arguments carefully but has found them unpersuasive. For the reasons below, the refusal to register the mark under Section 2(d) is maintained and continued.**

The examining attorney determined that the applicant's mark ATHENA 7 MINUTE LIFT for "herbal cosmetic cream facial treatment" in International Class 3 so resembles Registration Number 2375842, "L'ATHENE" for, "cosmetic preparations, namely, body lotions and conditioners, hand and facial creams, skin cleansing creams, etc." in International Class 3 that it is likely to cause confusion. The applicant has argued against the refusal to register stating that (1) the marks differ in sound, appearance, and meaning; (2) the actual use of the marks in commerce and the overall commercial impression is different; (3) the products of the applicant and the registrant are marketed through different markets. See Applicant's Response of 8/10/2006 ("Response"). The examining attorney finds these arguments unpersuasive and maintains and makes FINAL his refusal to register.

### Analysis

The examining attorney must analyze each case in two steps to determine whether there is a likelihood of confusion. First, the examining attorney must look at the marks themselves for similarities in appearance, sound, connotation and commercial impression. *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973). Second, the examining attorney must compare the goods or services to determine if they are related or if the activities surrounding their marketing are such that confusion as to origin is likely. *In re August Storck KG*, 218 USPQ 823 (TTAB 1983); *In re International Telephone and Telegraph Corp.*, 197 USPQ 910 (TTAB 1978); *Guardian Products Co., v. Scott Paper Co.*, 200 USPQ 738 (TTAB 1978). TMEP §§1207.01 *et seq.*

        (1)    Similarities of the Marks

Applicant:  ATHENA 7 MINUTE LIFT

Registrant:  L'ATHENE

The applicant's mark, ATHENA 7 MINUTE LIFT is a composite mark, of which L'ATHENA, by the applicant's own admission, is the dominant or "key" term. Response at 2. The emphasis of the first term in the mark is further supported by the use of the term on the product packaging, as submitted by the applicant, where ATHENA is in larger type and underlined, and 7 MINUTE LIFT is in smaller type below.

The marks are compared in their entireties under a Section 2(d) analysis, nevertheless, one feature of a mark may be recognized as more significant in creating a commercial impression. Greater weight is given to that dominant feature in determining whether there is a likelihood of confusion. *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985); *Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 189 USPQ 693 (C.C.P.A. 1976). *In re J.M. Originals Inc.*, 6 USPQ2d 1393 (TTAB 1987); TMEP §1207.01(b)(viii). With regard to the differences in L'ATHENE and ATHENA, the applicant submits that there are substantial differences in sound, appearance, and meaning. Response at 2. The examining attorney respectfully disagrees.

(2)     Sound

The primary difference in sound between these terms is indeed the sound of the first syllable, which starts with an 'L' sound with the inclusion of the French article in the registrant's mark. Applicant emphasizes that registrant's mark should be pronounced with two syllables, whereas applicant's mark is pronounced with three syllables. Response at 2. The examining attorney includes dictionary definitions from various sources illustrating that ATHENE, as used in registrant's mark, is pronounced with three syllables. The examining attorney notes that the ATHENE term may be pronounced with a long 'E' sound, but also notes that with regard to the ATHENE term may be pronounced with a long 'E' sound, but also notes that with regard to the Trademark Trial and Appeal Board has emphasized that there is no correct pronunciation of a trademark. *Kabushiki Kaisha Hattori Tokeiten v. Scuotto*, 228 USPQ 461 (TTAB 1985); *In re Great Lakes Canning, Inc.*, 227 USPQ 483 (TTAB 1985); *In re Teradata Corp.*, 223 USPQ 361, 362 (TTAB 1984); *In re Mack*, 197 USPQ 755 (TTAB 1977); TMEP §1207.01(b)(iv). The marks in question could clearly be pronounced the same. Similarity in sound alone may be sufficient to support a finding of likelihood of confusion. *RE/MAX of America, Inc. v. Realty Mart, Inc.*, 207 USPQ 960, 964 (TTAB 1980); *Molenaar, Inc. v. Happy Toys Inc.*, 188 USPQ 469 (TTAB 1975); *In re Cresco Mfg. Co.*, 138 USPQ 401 (TTAB 1963); TMEP §1207.01(b)(iv). The 'L' at the beginning of registrant's mark is significant, but the highly similar appearance and the near identical meaning as factors in the equation suggest that a strong likelihood of confusion remains.

(3)     Appearance

In appearance, the applicant seems to rely on the beginning 'L' of applicant's mark again, while also pointing the examiner to the way the marks are actually used in commerce by submission of applicant's packaging and registrant's packaging. *See* Exhibit A, Applicant's Response. Without the packaging and actual use in commerce, the examining attorney first notes that the phrase & MINUTE LIFT is descriptive of the applicant's goods, "herbal cosmetic cream facial treatment," and is entitled to less weight in the analysis. The matter is properly disclaimed (see Disclaimer Requirement, below). Disclaimed matter is typically less significant or less dominant when comparing marks. Although a disclaimed portion of a mark certainly cannot be ignored, and the marks must be compared in their entireties, one feature of a mark may be more significant in creating a commercial impression. *In re Dixie Restaurants Inc.*, 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997); *In re National Data Corporation*, 753 F.2d 1056, 224

(6)     Similarity of the Goods and Services

Applicant:     "herbal cosmetic cream facial treatment," in International Class 3;

Registrant:     "cosmetic preparations, namely, body lotions and conditioners, hand and facial creams, skin cleansing creams, skin cleansing lotions, essential oils for personal use; hair shampoos, conditioners, and treatments; bath and shower gels, oils, and scrubs; skin soaps, perfumes, facial and body powders, colognes, toilet and floral waters, and aromatherapy creams, lotions, and oils" in International Class 3;

A determination of whether there is a likelihood of confusion is made solely on the basis of the goods and/or services identified in the application and registration, without limitations or restrictions that are not reflected therein. *In re Dakin's Miniatures Inc.*, 59 USPQ2d 1593, 1595 (TTAB 1999). If the cited registration describes the goods and/or services broadly and there are no limitations as to their nature, type, channels of trade or classes of purchasers, then it is presumed that the registration encompasses all goods and/or services of the type described, that they move in all normal channels of trade, and that they are available to all potential customers. *In re Linkvest S.A.*, 24 USPQ2d 1716 (TTAB 1992); *In re Elbaum*, 211 USPQ 639 (TTAB 1981); TMEP §1207.01(a)(iii).

On the basis of the applications, the goods in this case appear to be identical. Applicant's "herbal cosmetic cream facial treatment," while not verbatim, appears be fully encompassed by registrant's "cosmetic preparations, namely... facial creams." The sole difference then, would be that applicant's identification includes the word "herbal," which does little to diminish the confusion. Registrant also has herbal supplement goods in Class 5, which suggests that registrant's goods are also herbal in nature. See the attached registration.

The applicant has submitted substantial information attempting to distinguish between the goods in this case. Applicant states that the L'ATHENE products are "created by nurses and marketed through medical offices, hospitals and spas," while the applicant's products are "marketed exclusively on the internet." Response at 2. Applicant also submits websites of the parties to this effect. Additionally, the applicant states that "L'ATHENE does not have a mask type wrinkle remover in the product line," and emphasizes that the consumers would purchase the goods at different locations, namely, the registrant at his or her doctor's office, and the applicant on the Internet. The applicant emphasizes that the Internet search for applicant's goods would not lead a consumer to registrant's goods, since the marks begin with a different letter. Response at 2. Lastly, the applicant states that "other than the fact that both the L'ATHENE and the ATHENA 7 MINUTE LIFT are both cosmetic creams, there is no similarity between the products," stating that the "sea of creams for wrinkle treatments" is so large that the consumer is unlikely to be confused due to his or her sophistication. Response at 3.

The examining attorney notes that both products are cosmetic creams for the face on the basis of the identification. Additionally, he believes that nothing the applicant has submitted dissuades him from this identical or near-identical comparison. Applicant states that both are

"cosmetic creams" and seems to note that both fall into the "sea of creams for wrinkle treatments." As to customer sophistication, the fact that purchasers are sophisticated or knowledgeable in a particular field does not necessarily mean that they are sophisticated or knowledgeable in the field of trademarks or immune from source confusion. *See In re Decombe,* 9 USPQ2d 1812 (TTAB 1988); *In re Pellerin Milnor Corp.,* 221 USPQ 558 (TTAB 1983); TMEP §1207.01(d)(vii). A similar customer sophistication argument would apply to nearly all consumer goods, which are most often purchased in a setting that leads to the *most* consumer confusion, amidst thousands of directly competing trademarks. As to the channels of trade, such near-identical goods are marketed toward the same individuals. Applicant's distinction that registrant's goods are "created by nurses and marketed through medical offices, hospitals and spas," seems to go against the submitted evidence by applicant that includes links to buy registrant's products on the Internet, just as the applicant markets its goods.

Thus, the examining attorney maintains that these goods are identical as stated on the applications and any difference in actual use in commerce is extremely minor.

### (ii)    *Applicant's Additional Arguments*

The applicant has also argued that the source of the goods can be determined by the consumer via the FDA's required information included on cosmetic packaging. It is easy to argue that consumers could determine any differences between marks with a thorough inquiry at the place of purchase, but such an argument does not protect the average consumer. For that reason, the test of likelihood of confusion is not whether the marks can be distinguished when subjected to a side-by-side comparison. The question is whether the marks create the same overall impression. *Recot, Inc. v. M.C. Becton,* 214 F.2d 1322, 54 USPQ2d 1894, 1890 (Fed. Cir. 2000); *Visual Information Inst., Inc. v. Vicon Indus. Inc.,* 209 USPQ 179 (TTAB 1980). The focus is on the recollection of the average purchaser who normally retains a general rather than specific impression of trademarks. *Chemetron Corp. v. Morris Coupling & Clamp Co.,* 203 USPQ 537 (TTAB 1979); *Sealed Air Corp. v. Scott Paper Co.,* 190 USPQ 106 (TTAB 1975); TMEP §1207.01(b). To hold each purchaser to such scrutiny would lead to allowing marks that were nearly identical on identical goods and thereby increasing consumer confusion.

The applicant also notes that L'ATHENE was not cited against Reg. No. 2802740. There, the mark ATHENA was used on "biological reagents sold as a kit to laboratories and hospitals for clinical and medical laboratory use to detect human antibodies in human blood serum for in vitro diagnostic purposes," and that attorney did not cite it against registrant's nutritional supplements. These are clearly different goods in different channels of trade despite applicant's reliance on the fact they are both in Class 5. In any event, the Examining Attorney is not bound by past decisions of the Trademark Examining Operation. *In re Shapely, Inc.,* 231 USPQ 72, 75 (TTAB 1986). The Examining Attorney must resolve any doubt regarding a likelihood of confusion in favor of the prior registrant and against the applicant who has a legal duty to select a mark that is totally dissimilar to trademarks already being used. *Burroughs Wellcome Co. v. Warner-Lambert Co.,* 203 USPQ 191 (TTAB 1979); *In re Hyper Shoppes*

*(Ohio), Inc.*, 837 F.2d 463, 6 USPQ2d 1025 (Fed. Cir., 1988). TMEP §§1207.01(d)(i).

> 2.    Summary of 2(d) Refusal

In sum, because the marks are highly similar and due to the highly related goods and services, registration of the applicant's mark must be refused because it is likely to cause confusion with the registrant's marks under Section 2(d) of the Trademark Act. The refusal to register the mark under Section 2(d) of the Trademark Act is, therefore, maintained and continued and made FINAL.

## Disclaimer Requirement Maintained and Continued and made FINAL

The examining attorney maintains and continues the requirement for a disclaimer of the phrase 7 MINUTE LIFT as a whole.

Applicant has agreed to enter the following disclaimer of 7 MINUTE apart from the mark as shown. See Response at 4.

 The examining attorney required the applicant to disclaim the descriptive wording 7 MINUTE LIFT for the goods in the Office Action of 4/4/2006.  In that action, the examining attorney explained that 7 MINUTE was merely descriptive of a feature of the goods, namely, the length of time that the goods were intended to work, and included website evidence of the applicant to this effect. That evidence is included here as well. As to the term LIFT, the examining attorney stated that LIFT was a shortened form of "face-lift," which merely described the intended purpose of the goods, to reduce wrinkles and sagging skin. The attached evidence also details applicant's goods with statements that LIFT refers to the same principles as a face-lift, with an emphasis on eliminating facial wrinkles. See also Exhibit B, Applicant's Response.

Terms such as 7 MINUTE that merely describe the time in which the goods are to be used are regularly disclaimed under USPTO practice. Enclosed are examples of registrations disclaiming similar terms. As to LIFT, the examining attorney maintains that LIFT refers exclusively to a face-lift *when viewed in context of the goods*, "herbal cosmetic cream facial treatment." Attached are copies from the USPTO's X-Search database that show the term LIFT disclaimed on similar goods and services, both for cosmetic surgical procedures and cosmetics similarly intended to minimize wrinkles. Additionally, these entries show the term LIFT used exactly as in applicant's mark, to refer to the reduction of wrinkles and sagging skin.

Applicant's arguments in this regard rely on (1) the term 7 MINUTE describing LIFT not the goods themselves, (2) the lack of a dictionary definition for LIFT referring specifically to facial treatments, (3) the parts of speech of the terms required to be disclaimed are such that their use is apparently suggestive and not descriptive, and (4) LIFT has a bevy of definitions that could mean any number of things. Response at 3. Thus, applicant argues, disclaimer should not be

required.

As to 7 MINUTE, the applicant states that it is describing the noun LIFT, with which the examining attorney agrees. 7 MINUTE, as an adjective, is used to describe LIFT, a term which is also descriptive of applicant's facial cream. Applicant then states that LIFT, as used as a noun, is not descriptive of the goods—it could only be descriptive in verb form, where it could mean, "to perform cosmetic surgery on the face, especially in order to remove wrinkles and sagging skin." Response at 3. However, the fact that a term is not found in the dictionary is not controlling on the question of registrability. *In re Gould Paper Corp.,* 834 F.2d 1017, 5 USPQ2d 1110 (Fed. Cir. 1987); *In re Orleans Wines, Ltd.,* 196 USPQ 516 (TTAB 1977); TMEP §1209.03(b). In this case however, there is extensive use of LIFT to refer to reduction of facial wrinkles and sagging. The examining attorney points to applicant's Exhibit F where the term, as a verb, means "to perform cosmetic surgery on (the face, for example, especially in order to remove wrinkles or sagging skin." Response, Exhibit F, pages 1 and 4. Additionally, Exhibit F references "face-lift" under the LIFT definition, and Exhibit E references "forehead lift" after the listed dictionary definitions. Response, Exhibit E, page 2, and Exhibit F, page 3 (citing Merriam Webster's Medical Dictionary, 2002). In the context of these goods, and whether intended as a noun or verb, the consumer will impart this definition to LIFT. Importantly, the attached registrations illustrate that this use is common in the field, as trademarks often alter the part of speech of a term with regard to the product yet it retains its descriptive quality.

The principal issue with regard to descriptive terms and disclaimers is whether the term merely describes to consumers the goods or a feature, quality, or characteristic of them. 7 MINUTE LIFT, when used on these goods, conveys directly to consumers that this product is used to reduce facial wrinkles (LIFT) and features a seven-minute time period in which it works (7 MINUTE). Thus, applicant's focus on the parts of speech is misguided here. The phrase as a whole is descriptive, even if 7 MINUTE is used as an adjective describing LIFT as a noun. The fact that "7 Minute to perform cosmetic surgery on the face" is nonsensical does not address the descriptiveness of these terms to the goods' consumers. Response at 4. Nor does the fact that LIFT could mean other things in other contexts. LIFT describes the goods as applied, "herbal cosmetic cream facial treatment." The fact that it could mean "to make one feel better," "raise one's spirits," "physically transport one to a different location," etc., does not address the use of LIFT in this context. Response at 4. Thus, when applicant states that the words "do not necessarily describe a facial cream," it again misses the mark—the words are *in fact to be used on facial cream* and merely describe that product.

In sum, the examining attorney continues and maintains and makes FINAL his requirement for a disclaimer of 7 MINUTE LIFT. The examining attorney accepts applicant's disclaimer of 7 MINUTE, but believes the phrase as a whole should be disclaimed under USPTO practice. See TMEP §1213.08(b).

      3.     For Applicant's Information Only

If applicant fails to respond to this final action within six months of the mailing date, the

application will be abandoned.  15 U.S.C. §1062(b); 37 C.F.R. §2.65(a).  Applicant may respond to this final action by:

(1) (1)  submitting a response that fully satisfies all outstanding requirements, if feasible (37 C.F.R. §2.64(a)); and/or

(2) (2)  filing an appeal to the Trademark Trial and Appeal Board, with an appeal fee of $100 per class (37 C.F.R. §§2.6(a)(18) and 2.64(a); TMEP §§715.01 and 1501 *et seq.*; TBMP Chapter 1200).

In certain circumstances, a petition to the Director may be filed to review a final action that is limited to procedural issues, pursuant to 37 C.F.R. §2.63(b)(2).  37 C.F.R. §2.64(a).  *See* 37 C.F.R. §2.146(b), TMEP §1704, and TBMP Chapter 1201.05 for an explanation of petitionable matters.  The petition fee is $100.  37 C.F.R. §2.6(a)(15).

/Peter Bromaghim/
Trademark Examining Attorney
Law Office 107
Phone: (571)-272-8912
Fax: (571)-273-8912

**HOW TO RESPOND TO THIS OFFICE ACTION:**
- ONLINE RESPONSE:  You may respond using the Office's Trademark Electronic Application System (TEAS) Response to Office action form available on our website at http://www.uspto.gov/teas/index.html.  If the Office action issued via e-mail, you must wait 72 hours after receipt of the Office action to respond via TEAS.  **NOTE: Do not respond by e-mail.  THE USPTO WILL NOT ACCEPT AN E-MAILED RESPONSE.**
- REGULAR MAIL RESPONSE:  To respond by regular mail, your response should be sent to the mailing return address above, and include the serial number, law office number, and examining attorney's name.  **NOTE:  The filing date of the response will be the *date of receipt in the Office,*** not the postmarked date.  To ensure your response is timely, use a certificate of mailing.  37 C.F.R. §2.197.

**STATUS OF APPLICATION:** To check the status of your application, visit the Office's Trademark Applications and Registrations Retrieval (TARR) system at http://tarr.uspto.gov.

**VIEW APPLICATION DOCUMENTS ONLINE:** Documents in the electronic file for pending applications can be viewed and downloaded online at http://portal.uspto.gov/external/portal/tow.

**GENERAL TRADEMARK INFORMATION:** For general information about trademarks, please visit the Office's website at http://www.uspto.gov/main/trademarks.htm

---

**FOR INQUIRIES OR QUESTIONS ABOUT THIS OFFICE ACTION, PLEASE
CONTACT THE ASSIGNED EXAMINING ATTORNEY SPECIFIED ABOVE.**

---

TDR Home

This document may be displayed as a PDF file containing images without text. You may view
online or save the entire document by clicking on the file download icon in the upper right corner
of this page. [required PDF viewer]
FAQ: Are you seeing only the first page of this PDF document?

*If you need help:*

- ***General trademark information:*** *Please e-mail TrademarkAssistanceCenter@uspto.gov,
  or telephone either 571-272-9250 or 1-800-786-9199.*
- ***Technical help:*** *For instructions on how to use TDR, or help in resolving **technical**
  glitches, please e-mail TDR@uspto.gov. If outside of the normal business hours of the
  USPTO, please e-mail Electronic Business Support, or call 1-800-786-9199.*
- ***Questions about USPTO programs:*** *Please e-mail USPTO Contact Center (UCC).*

*NOTE: Within any e-mail, please include your telephone number so we can talk to you directly,
if necessary. Also, include the relevant serial number or registration number, if existing.*

# EXHIBIT C

Table 1: Annual Estimates of the Population for the United States, Regions, States, and Puerto Rico: April 1, 2000 to July 1, 2007

| Geographic Area | Population Estimates | | | | | | | | April 1, 2000 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | July 1, 2007 | July 1, 2006 | July 1, 2005 | July 1, 2004 | July 1, 2003 | July 1, 2002 | July 1, 2001 | July 1, 2000 | Estimates Base | Census |
| United States | 301,621,157 | 298,754,819 | 295,895,897 | 293,191,511 | 290,447,644 | 287,888,021 | 285,112,030 | 282,194,308 | 281,424,602 | 281,421,906 |
| Northeast | 54,680,626 | 54,590,172 | 54,504,684 | 54,458,728 | 54,327,381 | 54,128,785 | 53,910,115 | 53,667,649 | 53,594,782 | 53,594,378 |
| Midwest | 66,388,795 | 66,128,483 | 65,853,847 | 65,626,756 | 65,347,299 | 65,094,788 | 64,820,696 | 64,496,645 | 64,395,200 | 64,392,776 |
| South | 110,454,786 | 108,894,582 | 107,384,947 | 105,866,963 | 104,431,808 | 103,188,427 | 101,869,063 | 100,567,977 | 100,235,853 | 100,236,820 |
| West | 70,096,950 | 69,141,582 | 68,152,419 | 67,239,064 | 66,341,156 | 65,476,021 | 64,512,156 | 63,462,037 | 63,198,767 | 63,197,932 |
| Alabama | 4,627,851 | 4,590,240 | 4,539,611 | 4,508,540 | 4,488,071 | 4,471,006 | 4,463,224 | 4,451,887 | 4,447,351 | 4,447,100 |
| Alaska | 683,478 | 677,450 | 669,411 | 661,661 | 650,967 | 642,699 | 633,277 | 627,462 | 626,931 | 626,932 |
| Arizona | 6,338,755 | 6,165,689 | 5,952,083 | 5,744,367 | 5,579,307 | 5,444,881 | 5,301,097 | 5,167,260 | 5,130,615 | 5,130,632 |
| Arkansas | 2,834,797 | 2,809,111 | 2,772,152 | 2,742,898 | 2,720,006 | 2,703,310 | 2,690,254 | 2,678,397 | 2,673,400 | 2,673,400 |
| California | 36,553,215 | 36,249,872 | 35,990,312 | 35,721,991 | 35,376,833 | 34,963,866 | 34,525,902 | 34,004,051 | 33,871,655 | 33,871,648 |
| Colorado | 4,861,515 | 4,766,248 | 4,673,724 | 4,609,264 | 4,555,212 | 4,507,762 | 4,433,997 | 4,328,252 | 4,302,019 | 4,301,261 |
| Connecticut | 3,502,309 | 3,495,753 | 3,486,490 | 3,481,890 | 3,472,964 | 3,451,867 | 3,429,770 | 3,411,990 | 3,405,602 | 3,405,565 |
| Delaware | 864,764 | 852,747 | 840,558 | 827,671 | 815,798 | 804,875 | 795,126 | 786,463 | 783,600 | 783,600 |
| District of Columbia | 588,292 | 585,459 | 582,049 | 579,621 | 577,467 | 579,190 | 577,648 | 571,799 | 572,059 | 572,059 |
| Florida | 18,251,243 | 18,057,508 | 17,736,027 | 17,342,623 | 16,959,251 | 16,667,906 | 16,348,628 | 16,049,316 | 15,982,824 | 15,982,378 |
| Georgia | 9,544,750 | 9,342,080 | 9,107,719 | 8,921,371 | 8,740,008 | 8,591,169 | 8,422,127 | 8,230,919 | 8,186,816 | 8,186,453 |
| Hawaii | 1,283,388 | 1,278,635 | 1,267,581 | 1,254,172 | 1,240,325 | 1,228,763 | 1,218,553 | 1,211,586 | 1,211,537 | 1,211,537 |
| Idaho | 1,499,402 | 1,463,878 | 1,425,894 | 1,391,751 | 1,364,038 | 1,342,103 | 1,320,918 | 1,299,578 | 1,293,956 | 1,293,953 |
| Illinois | 12,852,548 | 12,777,042 | 12,719,550 | 12,680,053 | 12,625,246 | 12,578,317 | 12,516,683 | 12,439,219 | 12,419,956 | 12,419,293 |
| Indiana | 6,345,289 | 6,302,646 | 6,257,121 | 6,218,863 | 6,184,519 | 6,151,102 | 6,125,525 | 6,091,735 | 6,080,521 | 6,080,485 |
| Iowa | 2,988,046 | 2,972,566 | 2,955,587 | 2,946,009 | 2,935,991 | 2,931,084 | 2,930,031 | 2,928,246 | 2,926,382 | 2,926,324 |
| Kansas | 2,775,997 | 2,755,817 | 2,741,665 | 2,730,828 | 2,721,824 | 2,712,383 | 2,700,979 | 2,692,890 | 2,688,824 | 2,688,418 |
| Kentucky | 4,241,474 | 4,204,444 | 4,171,016 | 4,139,859 | 4,114,069 | 4,089,032 | 4,067,461 | 4,049,049 | 4,042,281 | 4,041,769 |
| Louisiana | 4,293,204 | 4,243,288 | 4,495,670 | 4,487,966 | 4,473,679 | 4,465,490 | 4,460,285 | 4,469,044 | 4,468,958 | 4,468,976 |
| Maine | 1,317,207 | 1,314,910 | 1,312,222 | 1,308,892 | 1,303,441 | 1,294,187 | 1,284,872 | 1,277,225 | 1,274,921 | 1,274,923 |
| Maryland | 5,618,344 | 5,602,017 | 5,573,163 | 5,537,662 | 5,494,136 | 5,433,822 | 5,374,956 | 5,310,916 | 5,296,508 | 5,296,486 |
| Massachusetts | 6,449,755 | 6,434,389 | 6,429,137 | 6,433,676 | 6,438,510 | 6,431,788 | 6,407,631 | 6,363,190 | 6,349,105 | 6,349,097 |
| Michigan | 10,071,822 | 10,102,322 | 10,107,940 | 10,102,720 | 10,075,217 | 10,043,737 | 10,006,963 | 9,955,417 | 9,938,482 | 9,938,444 |
| Minnesota | 5,197,621 | 5,154,586 | 5,113,824 | 5,085,626 | 5,052,497 | 5,020,624 | 4,984,100 | 4,934,185 | 4,919,492 | 4,919,479 |
| Mississippi | 2,918,785 | 2,899,112 | 2,900,456 | 2,886,860 | 2,868,343 | 2,859,196 | 2,853,579 | 2,848,424 | 2,844,658 | 2,844,658 |
| Missouri | 5,878,415 | 5,837,639 | 5,787,885 | 5,744,753 | 5,705,971 | 5,676,209 | 5,641,517 | 5,606,140 | 5,596,683 | 5,595,211 |
| Montana | 957,861 | 946,795 | 935,784 | 926,721 | 917,453 | 910,282 | 906,098 | 903,329 | 902,195 | 902,195 |
| Nebraska | 1,774,571 | 1,763,765 | 1,754,042 | 1,743,954 | 1,734,746 | 1,725,545 | 1,718,280 | 1,713,322 | 1,711,265 | 1,711,263 |
| Nevada | 2,565,382 | 2,492,427 | 2,408,948 | 2,329,960 | 2,238,336 | 2,167,645 | 2,095,331 | 2,018,494 | 1,998,257 | 1,998,257 |
| New Hampshire | 1,315,828 | 1,311,821 | 1,303,112 | 1,294,285 | 1,282,844 | 1,272,185 | 1,257,347 | 1,240,442 | 1,235,786 | 1,235,786 |

Page 1

From: http://www.census.gov/popest/states/tables/NST-EST2007-01.xls


EXHIBIT C

**Table 1. Annual Estimates of the Population for the United States, Regions, States, and Puerto Rico: April 1, 2000 to July 1, 2007**

| Geographic Area | July 1, 2007 | July 1, 2006 | July 1, 2005 | July 1, 2004 | July 1, 2003 | July 1, 2002 | July 1, 2001 | July 1, 2000 | April 1, 2000 Estimates Base | Census |
|---|---|---|---|---|---|---|---|---|---|---|
| New Jersey | 8,685,920 | 8,666,075 | 8,657,445 | 8,641,235 | 8,604,990 | 8,558,327 | 8,495,644 | 8,431,951 | 8,414,347 | 8,414,350 |
| New Mexico | 1,969,915 | 1,942,302 | 1,916,331 | 1,892,182 | 1,870,113 | 1,850,562 | 1,829,032 | 1,820,861 | 1,819,046 | 1,819,046 |
| New York | 19,297,729 | 19,281,988 | 19,262,545 | 19,258,479 | 19,207,652 | 19,132,542 | 19,076,610 | 18,996,571 | 18,976,821 | 18,976,457 |
| North Carolina | 9,061,032 | 8,869,442 | 8,679,089 | 8,538,378 | 8,421,149 | 8,319,293 | 8,203,565 | 8,079,777 | 8,046,491 | 8,049,313 |
| North Dakota | 639,715 | 637,460 | 635,938 | 636,814 | 633,159 | 633,861 | 636,385 | 641,236 | 642,200 | 642,200 |
| Ohio | 11,466,917 | 11,463,513 | 11,459,776 | 11,452,808 | 11,435,980 | 11,414,816 | 11,392,869 | 11,364,143 | 11,353,145 | 11,353,140 |
| Oklahoma | 3,617,316 | 3,577,536 | 3,535,926 | 3,516,552 | 3,499,937 | 3,485,515 | 3,464,818 | 3,454,058 | 3,450,654 | 3,450,654 |
| Oregon | 3,747,455 | 3,691,084 | 3,629,959 | 3,583,027 | 3,556,956 | 3,521,520 | 3,472,224 | 3,431,096 | 3,421,436 | 3,421,399 |
| Pennsylvania | 12,432,792 | 12,402,817 | 12,367,276 | 12,348,618 | 12,327,250 | 12,305,751 | 12,287,542 | 12,285,564 | 12,281,054 | 12,281,054 |
| Rhode Island | 1,057,832 | 1,061,641 | 1,066,721 | 1,072,859 | 1,072,629 | 1,066,888 | 1,058,474 | 1,050,807 | 1,048,319 | 1,048,319 |
| South Carolina | 4,407,709 | 4,330,108 | 4,254,989 | 4,201,437 | 4,146,770 | 4,104,683 | 4,062,933 | 4,023,628 | 4,011,816 | 4,012,012 |
| South Dakota | 796,214 | 788,467 | 780,046 | 774,129 | 766,882 | 761,995 | 758,852 | 755,713 | 754,844 | 754,844 |
| Tennessee | 6,156,719 | 6,074,913 | 5,989,309 | 5,912,063 | 5,853,371 | 5,801,841 | 5,754,637 | 5,703,415 | 5,689,262 | 5,689,283 |
| Texas | 23,904,380 | 23,407,629 | 22,843,999 | 22,454,811 | 22,085,973 | 21,730,350 | 21,340,494 | 20,948,843 | 20,851,799 | 20,851,820 |
| Utah | 2,645,330 | 2,579,535 | 2,505,013 | 2,430,841 | 2,373,260 | 2,336,872 | 2,292,177 | 2,244,431 | 2,233,198 | 2,233,169 |
| Vermont | 621,254 | 620,778 | 619,736 | 618,794 | 617,101 | 615,250 | 612,225 | 609,909 | 608,827 | 608,827 |
| Virginia | 7,712,091 | 7,640,249 | 7,557,588 | 7,464,033 | 7,370,557 | 7,281,659 | 7,190,468 | 7,104,992 | 7,079,030 | 7,078,515 |
| Washington | 6,468,424 | 6,374,910 | 6,270,838 | 6,189,869 | 6,118,988 | 6,061,872 | 5,990,518 | 5,911,652 | 5,894,140 | 5,894,121 |
| West Virginia | 1,812,035 | 1,808,699 | 1,805,626 | 1,804,618 | 1,803,223 | 1,800,090 | 1,798,860 | 1,807,050 | 1,808,350 | 1,808,344 |
| Wisconsin | 5,601,640 | 5,572,660 | 5,540,473 | 5,510,199 | 5,475,267 | 5,445,115 | 5,408,512 | 5,374,399 | 5,363,715 | 5,363,675 |
| Wyoming | 522,830 | 512,757 | 506,541 | 503,258 | 499,368 | 497,204 | 493,032 | 493,985 | 493,782 | 493,782 |
| **Puerto Rico** | 3,941,459 | 3,925,971 | 3,909,866 | 3,893,104 | 3,875,818 | 3,857,474 | 3,836,971 | 3,813,571 | 3,808,603 | 3,808,610 |

Note: The April 1, 2000 Population Estimates base reflects changes to the Census 2000 population from the Count Question Resolution program and geographic program revisions. See Geographic Terms and Definitions at http://www.census.gov/popest/geographic/ for a list of the states that are included in each region.

Suggested Citation:
Table 1: Annual Estimates of the Population for the United States, Regions, States, and Puerto Rico: April 1, 2000 to July 1, 2007 (NST-EST2007-01)
Source: Population Division, U.S. Census Bureau
Release Date: December 27, 2007

Page 2

# EXHIBIT D

Westlaw.

Slip Copy                                                                Page 1
Slip Copy, 2008 WL 78748 (D.Del.)
(Cite as: Slip Copy, 2008 WL 78748)

**H**
Energy Transp. Group, Inc. v. William Demant
Holding A/S
D.Del.,2008.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ENERGY TRANSPORTATION GROUP, INC.,
Plaintiff,
v.
WILLIAM DEMANT HOLDING A/S et al., De-
fendants.
No. C.A. 05-422 GMS.

Jan. 4, 2008.

Edmond D. Johnson, Pepper Hamilton LLP,
Thomas Henry Kovach, Parkowski, Guerke &
Swayze, P.A., Wilmington, DE, Maya M. Eckstein,
Brian M. Buroker, Christopher C. Campbell,
Thomas J. Scott, Pro Hac Vice for Plaintiff.
Mary B. Graham, James Walter Parrett, Jr., Donald
E. Reid, Morris, Nichols, Arsht & Tunnell LLP,
Wilmington, DE, John M. Romary, Brian K.
Shelton, Carl J. Pellegrini, David Cushing, William
Mandir, Pro Hac Vice, for Defendants.

*MEMORANDUM*

GREGORY M. SLEET, Chief District Judge.

**I. INTRODUCTION**

*1 On June 23, 2005, Energy Transportation Group,
Inc. ("ETG") filed this patent infringement action
against the above-captioned defendants. Presently
before the court is William Demant Holding A/S'
("WDH A/S") renewed motion to dismiss for lack
of personal jurisdiction. For the following reasons,
the court will deny the motion.

**II. BACKGROUND**

WDH A/S is a Danish corporation with its principal
place of business in Smrum, Denmark. WDH A/S is
the parent company of forty-five subsidiaries loc-
ated throughout the world, including the following
defendants who manufacture the allegedly in-
fringing products: Oticon A/S, a Danish corpora-
tion; WDH, Inc., a Minnesota corporation, with its
principal place of business in New Jersey; Oticon
Inc., a California corporation, with its principal
place of business in Somerset, New Jersey; Berna-
fon, LLC, a limited liability company organized un-
der the laws of New Jersey; and Bernafon AG, a
Swiss Atiengesellschaft. (D.I. 88, at 1.) WDH A/S
is a holding company that does not manufacture,
sell, advertise, offer to sell, trade, or import any
goods or services in the United States or anywhere
in the world. (*Id.* at 3.) It maintains its own finan-
cial statements and corporate records separate from
the financial statements and corporate records of its
subsidiaries. (*Id.* at 4.) WDH A/S is not registered
to do business in Delaware and has never contrac-
ted to supply goods or services in Delaware. (*Id.*) It
has not appointed an agent to accept service on its
behalf in Delaware or anywhere in the United
States. (*Id.*) It does not maintain any offices or oth-
er facilities in Delaware or the United States.(*Id.*) It
neither owns nor leases any real property in
Delaware or the United States. (*Id.*) It does not
maintain any bank accounts in Delaware and has
never contracted to supply services or things in
Delaware or the United States. (*Id.*)

ETG, a Delaware corporation with its principal
place of business in New York, New York, is the
assignee and owner of U.S. Patent Nos. 4,731,850
(the "'850 patent") and 4,879,749 (the "'749 pat-
ent") (collectively, the "patents-in-suit"). The '850
patent relates to a programmable digital hearing aid
system, while the '749 patent relates to a host con-
troller for the programmable digital hearing aid sys-
tem. ETG alleges that WDH A/S has induced in-
fringement of one or more claims of the patents-
in-suit. (D.I. 89, at 8.)

On October 31, 2005, WDH A/S filed a motion to
dismiss for lack of personal jurisdiction (D.I.87).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 78748 (D.Del.)
(Cite as: Slip Copy, 2008 WL 78748)

Page 2

ETG responded by opposing the motion or, in the alternative, requesting jurisdictional discovery. On November 30, 2006, the court held a scheduling conference, during which it orally denied WDH A/S' motion to dismiss and granted ETG's request for jurisdictional discovery. On December 4, 2006, the court issued an Order (D.I.135) reiterating its denial of WDH A/S' motion, outlining the scope of ETG's jurisdictional discovery, and limiting the scope of ETG's claim against WDH A/S to inducement of infringement. On August 20, 2007, WDH A/S filed a renewed motion to dismiss for lack of personal jurisdiction (D.I.353).

### III. STANDARD OF REVIEW

*2 WDH A/S moves to dismiss the complaint for lack of personal jurisdiction. "Rule 12(b)(2) of the Federal Rules of Civil Procedure requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant[ ]."*E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates,* 197 F.R.D. 112, 119 (D.Del.2000). In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of the state in which the court sits. *Transportes Aeros de Angola v. Ronair, Inc.,* 544 F.Supp. 864-65 (D.Del.1982). If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *Id.* (noting, however, the "intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elec., Inc.,* 948 F.Supp. 338, 342 (D.Del.1996) (citation omitted).

In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F.Supp. 53, 55 (D.Del.1982). However, ETG, the plaintiff, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over WDH A/S. *ICT Pharms., Inc. v.*

*Boehringer Ingelheim Pharms., Inc.,* 147 F.Supp.2d 268, 270-71 (D.Del.2001). To meet this burden, ETG must adduce facts which " 'establish with reasonable particularity' " that jurisdiction over WDH A/S exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 193 (D.Del.1996)).

### IV. DISCUSSION

#### A. Delaware's Long-Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del.Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over WDH A/S. WDH A/S contends that the court has no basis to assert jurisdiction, while ETG maintains that the WDH A/S' conduct satisfies the requirements of subsections (c)(1) and (c)(3) of the long-arm statute, under a stream of commerce theory. In other words, ETG's principle argument is that the court may exercise jurisdiction over WDH A/S, because WDH A/S has induced infringement by its distributors and co-defendants Oticon A/S, Oticon, Inc., Bernafon AG, and Bernafon, LLC.

Under subsection (c)(1), the court may exercise jurisdiction over a nonresident or agent of a nonresident who "transacts any business or performs any character of work or service in the State."DEL. CODE ANN. tit. 10 § 3104(c)(1). Subsection (c)(3) gives the court the authority to exercise jurisdiction over a nonresident or agent of a nonresident who "causes tortious injury in the State by an act or omission in this State."DEL.CODE ANN. tit. 10 § 3104(c)(3). Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state."*Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del.Super.1997). The Delaware Supreme Court has interpreted subsections (c)(1) and (c)(3) as specific jurisdiction provisions that require a "nexus" between the plaintiff's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 78748 (D.Del.)
(Cite as: Slip Copy, 2008 WL 78748)

Page 3

cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See LaNuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). In order to meet the requirements of subsections (c)(1) and (c)(3), WDH A/S' actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. Inc. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993).

**\*3** ETG asserts that the court should exercise jurisdiction under § 3104(c)(1) and/or (c)(3), because WDH A/S actively induced sales of infringing products in the United States and Delaware, via well-established distribution channels that it owned and controlled. ETG relies on *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558 (Fed.Cir.1994) for the proposition that a foreign company's actions in inducing infringement, here WDH A/S, give rise to personal jurisdiction in any United States forum where the infringing products are sold. ETG argues that WDH A/S and its subsidiaries "collaborate in many areas" and "to a wide extent also share resources and technologies."D.I. 387, at 7 (quoting WDH Holding Annual Report 2006, D.I. 388, Ex. 36 at DEM012313). Put differently, ETG argues that WDH A/S acted in consort with its subsidiaries to develop the allegedly infringing hearing aid products, then induced its subsidiaries to manufacture, sell, and distribute the infringing products in the United States and Delaware. ETG argues that these acts by WDH A/S caused the allegedly infringing products to be injected into the stream of commerce for sale in Delaware.

For support, ETG cites to a number of WDH A/S documents, including annual reports, press releases or announcements, and licensing agreements, as well as the company's website "www.demant.com." The website states that "The William Demant Holding Group develops, manufactures and sells products and equipment designed to aid the hearing and communication of individuals."D.I. 89-2, Ex. A-4; *see id.*Ex. A-6 ("In 2000, the William Demant

Holding Group acquired four major companies that have strengthened the distribution of hearing aids manufactured by both Oticon and Bernafon."). The annual reports of WDH A/S from 1999-2006 discuss profits and costs for the entire group of companies owned by it. Additionally, several of the annual reports describe the "shared functions" of the "Group," which include "co-ordinat[ing] and handl[ing] a substantial part of ... operational activities, such as purchasing, logistics, production facilities, IT infrastructure, quality management systems, service and technical support as well as finance and administration."(D.I. 388, at DEM012013, DEM012047, DEM012084, DEM012126, DEM012170.) Further, the Group sells its products direct to end users and to OEM customers through a number of distribution companies in selected countries. (*Id.* at DEM012013, DEM012047, DEM012084, DEM012126, DEM012170.) An announcement or press release from Niels Jacobsen ("Jacobsen"), President and CEO of WDH A/S, to the Copenhagen Stock Exchange, dated November 22, 2000, states that "William Demant Holding A/S has just concluded a joint venture and an OEM-agreement with a group of independent American hearing aid dispensers...."(*Id.*Ex. A-1 at 1.) The press release further states, "[b]y virtue of the recently concluded exclusive OEM-agreement, the clinics will in [the] future mainly sell OEM-products from the William Demant companies under the AVADA brand ."(*Id.*) Finally, the release states that "[t]he cooperation with the AVADA Group will strengthen the position of William Demant Holding A/S on the North American market...."(*Id.* at 2.)

**\*4** A license and development agreement between Widex A/S and William Demant Holding A/S further supports ETG's position. The agreement, dated March 22, 2002, specifically lists WDH A/S as a party and discusses a collaboration between WDH A/S and Widex with respect to a production method for hearing aid shells and an ear scanner. The agreement states that "WDH has *developed* a model (3 times real size) ear scanner (the "Ear Scanner"),

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4
Slip Copy, 2008 WL 78748 (D.Del.)
(Cite as: Slip Copy, 2008 WL 78748)

and applied for certain patents in relation to the Ear Scanner and has afterwards initiated a full-scale feasibility study in order to develop functional test models."(D.I. 388, Ex. 23 at DEM012958) (emphasis added). The scope of the agreement indicates that Widex and WDH A/S will jointly continue development of the Ear Scanner. (*Id.* at DEM012959, DEM012962.) The agreement is signed by Jacobsen on behalf of WDH A/S.

WDH A/S disagrees with ETG's assertion, arguing that it is merely a Danish holding company that did not know of the asserted patents before the suit was filed and did not undertake any affirmative acts to cause the accused products to enter the United States. As previously mentioned, WDH A/S contends that it does not manufacture, sell, advertise, offer to sell, trade, or import any goods or services in the United States or anywhere in the world. The crux of WDH A/S' argument is that, as a holding company, it had nothing to do with the accused products, it had no knowledge of the patents-in-suit, and it did not purposefully induce infringement in the United States, let alone purposefully direct activities to Delaware residents. Thus, according to WDH A/S, subjecting it to jurisdiction in Delaware is beyond the reach of the Delaware long-arm statute, and would violate due process.

The court is not persuaded by WDH A/S' argument. After having reviewed the record, the court finds that the evidence produced by ETG illustrates that WDH A/S is not merely just a passive holding company. The situation in the present case is analogous to that in *Beverly Hills Fan,* where the Federal Circuit found that jurisdiction was proper over foreign defendants when the plaintiff alleged that the defendants purposefully shipped the accused product into the forum through an established distribution channel. 21 F.3d at 1565. Quoting *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 297 (1980), the Federal Circuit highlighted: " '[I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the [defendants] to serve, directly or in-

directly, the market for its product ..., it is not unreasonable to subject it to suit.' " *Beverly Hills Fan,* 21 F.3 d at 1565. The court then concluded that the plaintiff had stated all of the necessary ingredients for an exercise of jurisdiction: "defendants, acting in consort, placed the accused [product] in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Id.* at 1566.In the present case, when viewed in light of the allegations, assertions in the affidavits, and evidence provided in ETG's appendix, the court concludes that ETG has stated the necessary ingredients for an exercise of jurisdiction over WDH A/S: WDH A/S acted in consort with its subsidiaries to place the accused products in the stream of commerce; it knew that the accused products foreseeably would be sold in the United States and Delaware; [FN1] and WDH A/S' conduct and connections with the forum state were such that it should reasonably have anticipated being brought to court here. *See Oakley, Inc. v. JOFA AB,* 287 F.Supp.2d 1111, 1117 (finding the exercise of jurisdiction consonant with due process: "the fact situation is more compelling here than in *Beverly Hills Fan Co.* given the peculiar relationship between the [Defendant seeking dismissal] and the other Defendants, which are its subsidiaries").

> FN1. Oticon's website directs customers to three providers of hearing aids located in Wilmington, Delaware. http://hcl.oticonusa.com/ (S(xhila545oy02kgqusfqwspft))/viewMap. aspx (last visited Dec. 27, 2007); http://hcl.oticonusa.com/(S(xhila545oy02kgq usfqwspft))/form.aspx (last visited Dec. 27, 2007) ("The hearing care professionals that are listed within the U.S. Hearing Center Locator represent an overview of currently active Oticon distributors trained in fitting Oticon products.")

**B. Due Process**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 78748 (D.Del.)
(Cite as: Slip Copy, 2008 WL 78748)

Page 5

**\*5** Having found that the exercise of jurisdiction is proper per Delaware's long-arm statute, the court must determine whether jurisdiction comports with the requirements of constitutional due process. To satisfy the due process prong of the jurisdictional analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (citation omitted). Specifically, ETG must show that WDH A/S "purposefully avail [ed] itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)); *see also Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 108-09 (1987). Due process, therefore, requires the court to consider whether it would be unreasonable for the court to assert jurisdiction under all the facts and circumstances.

As the *Beverly Hills Fan* court noted, "[i]n general, these cases are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum."21 F.3d at 1568. The court concludes that this is not one of those rare cases. Delaware's interest in the dispute is significant. Delaware has an interest in discouraging injuries that occur within the state, which extends to patent infringement actions such as the one here. *Id.* Additionally, the burden on WDH A/S of litigating in Delaware is not significant enough to outweigh Delaware's interest in the dispute. While WDH A/S will have to travel to the United States to defend itself, " 'progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome.' " *Id.* at 1569 (citing *World-Wide Volkswagen,* 444 U.S. at 294). Moreover, because many of the defendants are subsidiaries of WDH A/S, the burden of document and witness production will be

minimal to WDH A/S. *See* D.I. 88, at 2, 16-17 ("[A]s a manufacturer, seller, and/or designer, these defendants [the subsidiaries] can provide any potentially relevant documents or witnesses in this action."). Given the foregoing, the court concludes that it is not unreasonable to assert jurisdiction over WDH A/S. Accordingly, the court will deny WDH A/S' motion.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. WDH A/S' Renewed Motion to Dismiss for Lack of Personal Jurisdiction (D.I.353) is DENIED.

D.Del.,2008.
Energy Transp. Group, Inc. v. William Demant Holding A/S
Slip Copy, 2008 WL 78748 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.